**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Lawrence G. McMichael (*pro hac vice* admission pending)
Anne M. Aaronson (AA1679)
Catherine G. Pappas (CP0458)

*Proposed Counsel to the Debtors and Debtors in Possession*

| | |
|---|---|
| In re: <br><br> BINDER MACHINERY CO., LLC, <br><br> Debtor. | Chapter 11 <br><br> Case No. 16-28015 (___) <br><br> Joint Administration Requested |
| In re: <br><br> ROCBIN INVESTMENT CORP., <br><br> Debtor. | Chapter 11 <br><br> Case No. 16-28024 (___) <br><br> Joint Administration Requested |
| In re: <br><br> BINDER MANAGERIAL SERVICES, LLC, <br><br> Debtor. | Chapter 11 <br><br> Case No. 16-28020 (___) <br><br> Joint Administration Requested |
| In re: <br><br> BINDER REALTY OF SOUTH PLAINFIELD, LLC, <br><br> Debtor. | Chapter 11 <br><br> Case No. 16-28025 (___) <br><br> Joint Administration Requested |
| In re: <br><br> BINDER REALTY OF WINSLOW, LLC, <br><br> Debtor. | Chapter 11 <br><br> Case No. 16-28026 (___) <br><br> Joint Administration Requested |
| In re: | Chapter 11 |

119065091_1

| | |
|---|---|
| 76 MENDHAM ROAD, LLC,<br><br>                         Debtor. | Case No. 16-28028 (___)<br><br>Joint Administration Requested<br><br>Judge: _____<br><br>Hearing Date: _____, 2016 |

**CERTIFICATION OF ROBERT C. BINDER
IN SUPPORT OF FIRST DAY MOTIONS**

      I, Robert C. Binder, hereby declare under penalty of perjury:

      1.      I am the Manager and Chief Executive Officer of Binder Machinery Company, LLC ("Binder"), a New Jersey limited liability company, and Chairman of Rocbin Investment Corporation ("Rocbin"), a New Jersey corporation, each a debtor and debtor-in-possession in the above-captioned Chapter 11 cases. Debtors Binder Managerial Services, LLC ("Managerial"), Binder Realty of South Plainfield, LLC ("Plainfield"), Binder Realty of Winslow, LLC ("Winslow"), and 76 Mendham Road, LLC ("Mendham"), each a New Jersey limited liability company, are affiliates of Binder and Rocbin (collectively, Binder, Rocbin, Managerial, Plainfield, Winslow, and Mendham are referred to herein as the "Debtors"). I am the majority owner of Managerial, which in turn owns Plainfield. I am also the Manager of Winslow. In these capacities, and through my roles as Chief Executive Officer of Binder and Chairman of Rocbin, I am generally familiar with the Debtors' day-to-day operations, organizations, financial affairs, and books and records.

      2.      On the date hereof (the "Petition Date") each of the Debtors filed a voluntary petition with the Court for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors intend to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request

2

for the appointment of a trustee or examiner has been made in these Chapter 11 cases and, as of the date of the filing of this certification ("Certification"), no official committees have been appointed or designated. Concurrent with the filing of this Certification, the Debtors have sought procedural consolidation and joint administration of these Chapter 11 cases.

3.  To enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 cases on their organizations, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtors to transition effectively into Chapter 11 and minimize disruption, thereby preserving and maximizing the value of the Debtors' estates.

4.  I am familiar with the contents of each First Day Motion (including the exhibits and schedules in support thereof), and I believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element to achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.

5.  Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Certification on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6. Part I of this Certification describes the Debtors' operations, their capital and corporate structures and the circumstances surrounding the commencement of these Chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

## I. BACKGROUND

**A. Corporate Structure**

7. Binder, successor-in-interest to Binder Machinery Company ("BMC"), is a heavy construction machinery distribution business headquartered in South Plainfield, New Jersey. Binder's revenues are generated from machinery sales, rentals, parts, and services. Employing 87 individuals and enjoying a customer base of approximately 4,000 construction contractors, Binder has been a profitable and successful family owned business since it was founded in 1957 by the late Walter Binder.

8. Debtor Plainfield, a wholly-owned subsidiary of Debtor Managerial, owns the real property located at 2820 Hamilton Boulevard, South Plainfield, New Jersey, on which Binder operates its North Jersey headquarters facility and for which Binder pays rent to Plainfield's parent, Managerial.

9. Binder also has a South Jersey branch facility located at 201 N. Route 73, Winslow Township, New Jersey. Debtor Winslow owns the real property on which the South Jersey facility is located, and Binder pays rent to Winslow.

10. Debtor Rocbin functions both as an equipment distributor for Wirtgen compaction and milling products and as a real estate investment entity. Its assets include Debtor Mendham, which holds title to a parcel of real property that is currently occupied by my son, Brendan Binder and his family, who pay rent to Mendham for the use of this property.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

**B.    The Debtors' Business**

11.    Binder sells to every segment of the construction market, ranging from small landscapers to site developers to major highway and bridge builders.  In addition to all types of heaving earthmoving equipment, Binder carries many specialized products, including aggregate equipment, paving machines, cranes, telehandlers and purpose-built material handlers.  Binder also services the scrap and waste handling industries as well as material producers such as quarries and recyclers.  The segments of the construction market Binder services employ thousands of people throughout the state of New Jersey.

12.    Binder represents over a dozen world class manufacturers of construction equipment and implements, which makes it one of the most diversified distributorships in the Northeast.  Komatsu, Wirtgen, Hamm, Vogele, Sennebogen, SANY, Kinshofer, and Chicago Pneumatic are among the manufacturers for whom Binder and Rocbin provide distributor services.

13.    A significant portion of Binder's business is derived from its thirty year distributor relationship with Komatsu America Corp. and its affiliates (collectively, "Komatsu").  Komatsu is among the foremost worldwide manufacturers of core construction products.  The sale and service of Komatsu products currently accounts for approximately $37,000,000 of Binder's annual revenue, or approximately 65% of Binder's total revenue for 2016.

14.    Binder has historically held and continues to hold 20% of the New Jersey market for Komatsu products, and up to 40% of the market in certain months.  This market share is approximately twice the national average for construction equipment.  Binder has been consistently recognized by Komatsu as one of the top five Komatsu dealers in North America.  It has also received several awards from Komatsu acknowledging Binder's achievements as a top distributor of Komatsu products.

5

15.  Rocbin focuses its business on distribution of Wirtgen products. The Wirtgen Group is the number one worldwide manufacturer of milling, paving and compaction equipment, which are marketed through three respective entities: Wirtgen, Vogele and Hamm. Rocbin has represented Wirtgen since 2007 but has been considered to be the distributor of choice in New Jersey for paving and compaction equipment since 1985 and has consistently earned market share in excess of 50% for these products.

16.  Sennebogen is a German manufacturer of material handling equipment and is the number one manufacturer of its kind in the world. Binder has represented Sennebogen since 2004 and has maintained market share in excess of 50% for these products.

17.  The Debtors currently employ 87 individuals, substantially all of whom are located either at Binder's headquarters in South Plainfield or the South Jersey facility in Winslow Township. Those employees consist of six (6) executives; seven (7) managers; sixteen (16) administrative and support staff; eleven (11) product support sales representatives; eleven (11) hourly parts personnel (who are unionized); and thirty-eight (38) hourly service personnel (who are also unionized). Binder enjoys excellent relations with the union, the Operating Engineers Local 825. Indeed, the past actions of the union evidence a commitment to the success of the Debtors and a willingness to cooperate with existing ownership and management. The Debtors' employees, and the thousands of customers across the industry that those employees serve, remain the backbone of the Debtors' success.

C.  **The Debtors' Capital Structure**

18.  On December 23, 1989, Binder's predecessor-in-interest, BMC, and Komatsu entered into a Distributor Sales and Service Agreement (the "1989 Distributor Agreement") whereby Komatsu agreed to establish BMC as the distributor of certain Komatsu products in New Jersey.

19. On May 29, 1991, Komatsu and BMC entered into a Dresser Products Distributor Sales and Service Agreement (the "1991 Distributor Agreement") whereby Komatsu agreed to establish BMC as the distributor of certain Komatsu products in New Jersey.

20. On June 3, 1991, Komatsu and BMC entered into a Domestic Distributor Sales and Service Agreement No. 4178 (the "June 1991 Distributor Agreement") whereby Komatsu agreed to establish BMC as the distributor of certain Komatsu products in New Jersey.

21. On May 8, 1998, Komatsu and BMC entered into a Distributor Sales and Service Agreement (the "1998 Distributor Agreement," together with the 1989 Distributor Agreement, the 1991 Distributor Agreement and the June 1991 Distributor Agreement, and any other Distributor Agreement between BMC and Komatsu, collectively the "Distributor Agreements") [2] whereby Komatsu agreed to establish BMC as the distributor of certain Komatsu products in New Jersey.

22. In connection with the Distributor Agreements, Komatsu extended certain credit facilities to BMC for the purpose of providing floor plan financing and other financing to purchase Komatsu products (the "Komatsu Credit Facility").

23. In addition to the Komatsu Credit Facility, on July 12, 2006, BMC and its affiliates and subsidiaries entered into a Loan and Security Agreement with Sun National Bank ("Sun"), a New Jersey financial institution, whereby Sun agreed to extend a certain credit Facility to BMC and its respective affiliates and subsidiaries (the "Sun Credit Facility").

24. As collateral for the Sun Credit Facility, Sun required the pledge of all voting stock in BMC and Rocbin. Additionally, under the Sun Credit Facility, Sun acquired a first position security interest in all of BMC's property.

---

[2] Upon information and belief, these are the only Distributor Agreements in effect between Komatsu and Binder. However, to the extent additional Distributor Agreements exist, those agreements are also incorporated.

119065091_1

25. As part of the agreement concerning the Sun Credit Facility, Komatsu required Sun's lien on BMC property be a junior lien position on any such property pledged by BMC to secure the Komatsu Credit Facility.

26. On July 12, 2006, Sun and Komatsu entered into an Intercreditor Agreement whereby Komatsu and Sun agreed to set forth the relative priority of their respective liens and security interests in the property of BMC, which secured their respective obligations and financing arrangements with BMC.

27. Effective as of January 1, 2008, BMC assigned all of its assets, including the Distributor Agreements, to Binder. Binder further assumed all liabilities of BMC, including liability under the Komatsu Credit Facility.

28. Binder was subsequently added as a borrower under the Sun Credit Facility, pursuant to which Sun was granted a first position security interest in all of Binder's property and a majority of the membership interests of Binder were pledged to Sun.

29. In addition to providing financing to BMC and Binder over the years, Sun also provided funding to Rocbin, Managerial and Winslow through term loans. Each of the Debtors was a borrower under the various loans and lines of credit provided by Sun.

30. These loans and lines of credit were amended and restated on or about December 21, 2011, when an Amended and Restated Consolidated, Amended and Restated Loan and Security Agreement (the "<u>Loan Agreement</u>") was executed by Sun and the Debtors. The Loan Agreement obligated the Debtors to repay a Revolving Line of Credit and two term loans, all in the aggregate amount of approximately $31 million.

31. Substantially all of the assets of each of the Borrowers were pledged as collateral for the obligations owed pursuant to the Sun Credit Facility.

119065091_1

32. On September 10, 2013, Sandton Capital Partners, LP ("Sandton") acquired Sun's interests in the Sun Credit Facility by assignment, including Sun's interests in certain foreclosure litigation that had been initiated by Sun. To obtain forbearance from Sandton and prevent a foreclosure of its properties while the Debtors sought to refinance the Sun Credit Facility, on or about October 9, 2013, Sandton and the Debtors executed an Amendment and Forbearance Agreement (the "2013 Forbearance Agreement") pursuant to which Sandton agreed to forbear exercising its rights against the Debtors, reduced the outstanding indebtedness under the Sun Credit Facility to $15,300,000 and extended approximately $3.7 million in credit under the existing Sun Credit Facility to the Debtors to satisfy specified obligations in exchange for additional security, guarantees and payment obligations from the Debtors. Due to the Debtors' subsequent defaults, the Amendment and Forbearance Agreement was amended on August 19, 2014 via a Waiver and First Amendment to Amendment and Forbearance Agreement to adjust certain terms of the 2013 Forbearance Agreement, provide that Sandton was no longer obligated to make advances under the Sun Credit Facility and to limit compensation to certain of the Debtors' principals and the guarantors of the Sun Credit Facility.

33. In July 2015, the Debtors sold $1,000,000 of their unused equipment inventory to Joseph Morris. Morris then consigned the inventory back to the Debtors to sell on his behalf and filed a UCC-1 financing statement reflecting the consignment. Later in 2015, Morris lent me, the principal of the Debtors, $500,000 on an unsecured basis. This loan was documented by a note that was signed by me individually. I contributed the proceeds to the Debtors. In 2016, Morris released the UCC-1, the Debtors assumed the entire obligation to Morris and executed a note in the amount of $1,421,819.20, the then outstanding principal balance, accrued interest and fees. This note was intended to be secured by a third lien on all of the Debtors' assets but the security

documents and the inter-creditor agreement required by the Debtors' senior lender were not completed prior to the filing of the petitions in these cases.

34. On December 4, 2015, the Debtors entered into a financing transaction with Callidus Capital Corporation ("Callidus") pursuant to which it was able to restructure its existing secured debt with Sandton.

35. Pursuant to the December 4, 2015 transaction, Callidus replaced Sandton as the Debtors' senior secured lender, extending four loans, including a working capital line of credit, to the Debtors and obtaining a first lien position on substantially all of the Debtors' property.

36. The proceeds of the Callidus financing transaction were used to satisfy the majority of the Sun Credit Facility owned by Sandton, with the exception of a balance of approximately $2.0 million, which is subordinate to Callidus' security interests in the Debtors' property.  Sandton acquired warrants for 49% of the equity in Binder Machinery Company LLC as part of the financing transaction and Komatsu retained its liens, subordinate to Callidus' and Sandton's security interests and subject to the terms of an intercreditor agreement among the various lenders.  The balance presently owed to Sandton, including accrued interest and fees, is approximately $2.8 million.

37. As of September, 2016, the Debtors were: obligated under the Komatsu Credit Facility in the approximate aggregate amount of $25,000,000; under the Sun Credit Facility in the approximate aggregate amount of $2.8 million; under the Callidus Credit Facility in approximate amount of $15,800,000; and, to Mr. Morris in the approximate amount of $1,421,819.

D. **Events Leading to the Commencement of these Chapter 11 Cases**

38. During the economic recession, the Debtors aggressively streamlined their cost structure to reposition Binder to operate functionally in a lean environment.  Indeed, the effects

10

of the recession were devastating across the construction industry. For example, for the core construction products that Binder represents, in any given "good" year there could be approximately 1,100 to 1,500 total units sold in New Jersey. In 2006 the total market was 714 units, of which Binder had a share of 28.3%. In 2009, the market bottomed out at 196 total units, with Binder's share at 34.2%. By 2012, the market had only rebounded to 305 total units, of which Binder had a 28.5% share. The industry remains depressed to date. Simply put, Binder has consistently remained competitive in the market, but the market contraction has been sharp and challenging.

39.     Against this backdrop, since 2007, Binder has reduced employee headcount from 155 to its current level of 87. The company reduced expenses by 45%, which was achieved not only by headcount reductions, but also by compensation reductions, benefit eliminations, and curbed purchasing and expenditures.

40.     Prior to December of 2015, Binder, for a period with the assistance of a financial advisor, sought to restructure its secured debt and obtain sufficient working capital to remedy its financial condition. Binder was able to obtain a series of forbearance periods from Komatsu and its prior lender, Sun, as well as Sun's successor, Sandton, while it sought refinancing.

41.     Also, prior to December of 2015, Binder's former financial advisory firm, Carl Marks Advisory Group ("CMAG") initiated litigation against Binder in the Supreme Court of New York, seeking payment of approximately $1.4 million in fees pursuant to a 2011 Financial Advisory Agreement between Binder and CMAG. CMAG alleges that Binder breached the parties' 2011 Financial Advisory Agreement by not paying the fees and/or on the basis of quantum meruit. A decision on the parties' cross-motions for summary judgment is pending.

119065091_1

42. In December of 2015, Binder closed a financing transaction with Callidus, as set forth above, that provided Binder with financing to restructure its credit facility with Sandton and provided operating capital for Binder's continued operations.

43. While Binder has been able to continue operations and make strides to remedy its financial condition, during the summer of 2016, certain debt payments became due and owing to Komatsu. Binder requested, and Callidus agreed to, an "overadvance" of $750,000 in order to enable Binder to meet these obligations.

44. Despite its best efforts, Binder was unable to raise sufficient capital to fully satisfy further obligations falling due in September 2016 and requested that Komatsu provide a short extension of the deadline in order for Binder to remain in compliance under the terms of the Komatsu Credit Facility. Komatsu refused. Binder also requested another extension of credit from Callidus in order to satisfy the September 2016 obligations owed to Komatsu. Komatsu refused to extend the deadline, and Callidus was not willing to further extend credit. Binder's efforts to locate alternative financing were not successful.

45. The Debtors' short-term prospects have been further damaged by the inability of the New Jersey Governor and Legislature to agree on funding New Jersey Highway Trust Fund. Due to lack of funding of this trust fund, over 900 New Jersey highway construction and repair projects have been idled, resulting in the layoff of thousands of workers, the return of rental equipment and the suspension by contractors of new equipment purchases and existing equipment servicing. This situation has had an immediate and severe impact on the Debtors' cash flow.

46. Accordingly, due to the Debtors' lack of liquidity sufficient to meet the payments due in September 2016, and in light of the many issues outlined above, the Debtors have made

the difficult but necessary decision to seek the protections of Chapter 11 in this Court in order to prevent the cessation of business operations while they pursue and orderly, going concern sale of their operations so that they are best able to resolve their financial issues.

### E. Objectives of these Chapter 11 Cases

47. The Debtors filed these cases to facilitate further cost reductions, to curtail and or eliminate product and service lines that are unprofitable, and to prevent the threatened terminations of its dealerships, which are the heart of the Debtors' business.

48. The Debtors maintain strong market share and expect that they will continue to do so. To date in 2016, the Debtors are generating positive earnings before interest, taxes, depreciation, and amortization ("EBITDA"). The Debtors expect that their strong market position will enable a return to a healthy financial position as the regional and national economies recover from the effects of the severe recession. Undoubtedly, the continued viability of the Debtors' businesses is in the best interests of their constituents, including employees, creditors, customers, and the New Jersey construction community that the Debtors serve. The Debtors intend to stabilize and reinforce that viability through these proceedings, ultimately leading to a sale.

## II. FIRST DAY MOTIONS

### A. Procedural Motions

#### 1. Motion for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")

49. By the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for all of the jointly-administered cases under the case of Binder Machinery Co., LLC. Joint administration of these Chapter 11

Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor. Entry of an order directing joint administration of these cases will permit the Debtors to reduce fees and costs in connection with the administration of these cases by avoiding the duplication of efforts associated with, for example, filing multiple duplicative documents in the Debtors' various individual cases, monitoring each of the Debtors' individual dockets and maintaining individual case files for each of the Debtors that will largely duplicate one another. In addition, the ability of parties in interest to monitor these cases will be facilitated by having all pleadings grouped together on one docket. Joint administration also will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files. Finally, supervision of the administrative aspects of these Chapter 11 Cases by the Office of the United States Trustee for the District of New Jersey will be simplified.

50.    The Debtors in these Chapter 11 Cases are affiliated entities. The Debtors request that, in light of the fact that Binder Machinery Co., LLC and its affiliates have each filed petitions in this Court, the Court can and should jointly administer the Chapter 11 Cases. Jointly administering these Chapter 11 Cases will ease the administrative burden on the Court and the parties, will protect creditors of different estates, and will simplify the United States Trustee's supervision of the administrative aspects of the Chapter 11 Cases.

**2.    Motion for Entry of an Order Extending the Time to File Schedules and Statement of Financial Affairs (the "Extension Motion")**

51.    By the Extension Motion, the Debtors are requesting additional time within which to file their Schedules Statement of Financial Affairs (collectively, the "Schedules and Statements"). The Debtors' businesses are large and complex and compiling the information required for the Schedules and Statements is a lengthy and difficult process. In addition, the

Debtors' key accounting and legal personnel must address numerous critical operational matters in the early days of these Chapter 11 Cases and diverting their attention away from these matters would harm the Debtors' ability to successfully transition in Chapter 11. The Debtors are requesting an extension to file the Schedules and Statements through and including November 19, 2016.

### 3. Application for Treatment as a Complex Chapter 11 Case (the "**Complex Ch. 11 Application**")

52. By the Complex Ch. 11 Application, the Debtors are seeking to have these cases treated as a complex Chapter 11 case that will be governed by the Bankruptcy Court's General Order setting forth the procedural and case management process for Complex Chapter 11 cases. Application of the case management procedures will best ensure the prompt and efficient resolution of issues that arise in the Debtors' Chapter 11 cases and will aid in the preservation of the assets of the estate for all parties in interest.

### B. Operational Motions

#### 1. Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, And 507 And Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Secured Lenders, (V) Modifying The Automatic Stay; (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "**Cash Collateral and DIP Motion**")

53. The Debtors seek entry of an interim order (a) authorizing them to use the Cash Collateral of the Prepetition Lenders and granting adequate protection to the Prepetition Lenders; (b) authorizing Debtors to obtain secured post-petition financing pursuant to sections 363 and 364 of the Bankruptcy Code; (c) authorizing Debtors to enter into the Debtor-in-Possession Ratification and Amendment Agreement; (d) granting liens and super-priority claims to DIP Lender pursuant to section 364 of the Bankruptcy Code; (e) granting adequate protection

15

pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code; (f) modifying the automatic stay to implement the terms of the Interim and Final Orders; (g) prescribing form and manner of notice; and, (h) scheduling final hearing on the Motion and prescribing the form and manner of notice and setting the time for the final hearing on the Cash Collateral Motion.

54. In the absence of access to Cash Collateral and DIP Financing, the Debtors' operations would be crippled and the value of the Prepetition Lenders' collateral and the Debtors' estate would be thoroughly diminished. Indeed, without the use of Cash Collateral and DIP Financing, the Debtors will suffer immediate and irreparable harm, their business operations will be shuttered, and all going concern value of the enterprise will be lost.

55. As set forth fully in the Cash Collateral and DIP Motion, the Debtors have proposed a Budget that they believe is reasonable, and have offered to adequately protect the Prepetition Lenders' interests.

56. Therefore, I believe and the Debtors submit that the use of Cash Collateral and entry into a Ratification and Amendment Agreement to obtain DIP Financing on the terms set forth in the proposed Interim Order and corresponding Budget is in the best interests of the Debtors, the Prepetition Lenders, and all parties in interest. As such, the relief requested in the Cash Collateral and DIP Motion should be granted.

**2. Motion for Entry of an Order Authorizing the Debtors to Continue Insurance Coverage Entered into Pre-Petition and Honor Obligations Related Thereto (the "Insurance Motion")**

57. In connection with the operation and management of their organizations, the Debtors maintain numerous insurance policies, providing coverage for, among other things, general liability, workers' compensation liability, automobile, director and officer fiduciary liability, employment practices liability, property and a Key Man Policy (collectively, the

16

119065091_1

"Insurance Policies"). A Schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit B.

58. The Debtors believe that the continuation of the Insurance Policies is essential to the ongoing operations of the Debtors' businesses. The Debtors intend to continue making premium payments as they come due on each of the Insurance Policies. The Debtors are current on all premium payments and are filing the Insurance Motion out of an abundance of caution.

59. By the Insurance Motion, the Debtors request authority to continue the Insurance Policies uninterrupted and pay any pre- or post-petition amounts related to the Insurance Policies to the extent that the Debtors determine, in their discretion, that payment is necessary or appropriate.

### 3. Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utility Motion")

60. In connection with the operation of their businesses, the Debtors obtain telephone, internet, gas, electric and other similar utility services provided by a number of utility companies (the "Utility Providers"). The Utility Providers service the Debtors' corporate offices in South Plainfield, New Jersey and the Debtors' property in Winslow Township, New Jersey. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtors' ability to properly service their customer and vendor needs, thereby negatively impacting the possibility of maintaining those customer and vendor relationships. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their operations and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 Cases.

119065091_1

61.  By the Utility Motion, the Debtors seek the entry of interim and final orders: (a) determining that their Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtors' proposed adequate assurance procedures; and (e) determining that the Debtors are not required to provide any additional adequate assurance, beyond what is proposed by the Utility Motion.

**4.   Motion for an Order (a) Authorizing the Debtors to Pay Certain Prepetition (i) Wages, Salaries, Bonuses, and Other Compensation, (ii) Reimbursable Employee Expenses, and (iii) Employee Medical and Similar Benefits; and (b) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "<u>Wages Motion</u>")**

62.  To minimize the personal hardship that the Debtors' employees would suffer if pre-petition employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, by the Wages Motion, the Debtors seek authority to pay and honor, in their sole discretion, certain pre-petition claims for, among other items: wages, salaries, commissions, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, taxes, and 403(b) contributions), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life insurance, long-term and short-term disability coverage, floating holidays and all other benefits that the Debtors have historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

119065091_1

5. **Motion for Entry of an Order (a) Authorizing, but not Directing, the Debtors to Remit and Pay Certain Taxes and Fees and (b) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the "Tax Motion")**

63. In the ordinary course of their business, the Debtors incur real property tax, New Jersey sales tax and other tax obligations that must be paid in order for the Debtors to continue to operate.

64. Accordingly, by the Taxes Motion, the Debtors seek entry of an order authorizing the Debtors to pay certain real property and New Jersey sales tax obligations as they come due. Certain of these tax obligations, particularly the third quarter property taxes, came due and were timely paid shortly before the Petition Date. The Debtors will owe New Jersey sales tax as of September 20, 2016, as set forth in the Taxes Motion.

65. Payment of these obligations in the ordinary course of business will enable the Debtors to continue operating their business in compliance with state law and without incurring interest and penalties on unpaid tax obligations.

6. **Motion of the Debtors for Entry of an Order: (A) Authorizing the Debtors to (I) Continue Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms and (III) Maintain Existing Investment Practices; and (B) Granting Post-petition Intercompany Claims Administrative Expense Priority (the "Cash Management Motion")**

66. The Debtors seek entry of an order: (a) authorizing the Debtors to (i) continue their Cash Management System, (ii) maintain their existing Bank Accounts and Business Forms and (iii) maintain their existing Investment Practices; and (b) granting post-petition Intercompany Claims administrative expense priority. The Debtors also request that the Court authorize the Debtors' banks to continue to maintain, service and administer the Bank Accounts. The Debtors request the Court authorize the banks to debit the Bank Accounts in the ordinary course of business on account of: (a) all checks drawn on the Bank Accounts and which are

cashed at the banks' counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (b) all checks or other items deposited in one of the Debtors' accounts with the banks prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtors were responsible for such items prior to the Petition Date and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the banks as service charges for the maintenance of the Cash Management System.

67. The use of the Cash Management System is essential to enable the Debtors to centrally control and monitor corporate funds, ensure cash availability and liquidity, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balance and presentment information. These controls are crucial given the significant volume of cash transactions managed through the Cash Management System.

### III.    CONCLUSION

68. For all of the foregoing reasons and those more fully set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as the Court may deem appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information, and belief as set forth in this Certification.

Dated: September 20, 2016

Robert C. Binder
Manager and Chief Executive
Officer of Binder Machinery
Co., LLC

119065091_1